United States District Court
Southern District of Texas
**ENTERED**
September 16, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| Darryl S.,[1] | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action H-25-4724 |
| | § | |
| Frank J. Bisignano,[2] | § | |
| Commissioner of the Social | § | |
| Security Administration, | § | |
| *Defendant*. | § | |

**MEMORANDUM AND ORDER**

Darryl S. appeals the Social Security Administration Commissioner's final decision denying his application for Social Security benefits. ECF No. 1. Pending before the court are Plaintiff's Motion for Summary Judgment, ECF No. 11, and the Commissioner's Motion for Summary Judgment, ECF No. 15. The parties consented to the jurisdiction of the undersigned magistrate judge for all purposes, including entry of final judgment. ECF Nos. 6, 7. Plaintiff's Motion for Summary Judgment is **DENIED**. The Commissioner's Motion for Summary Judgment is **GRANTED**. The Commissioner's final decision is **AFFIRMED**.

[1] In light of guidance received from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which states that there are significant privacy concerns in social security cases, the court refers to the Plaintiff only by either their first name or their first name and last initial.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Frank J. Bisignano is substituted as the defendant in this suit.

### *1. Procedural Posture*

On June 9, 2022, Darryl filed applications for disability insurance benefits, under Title II of the Social Security Act, and supplemental social security income benefits, under Title XVI of the Social Security Act. Tr. 176–81, 184–85. Darryl alleged that he was disabled due to major depressive disorder, generalized anxiety disorder, insomnia, and pain in his back, left shoulder, and neck caused by a motor vehicle accident on April 30, 2022. Tr. 221, 225. Originally, Darryl alleged that his disability began on September 1, 2019, but he later amended the alleged disability onset date to April 30, 2022. Tr. 14, 36, 176, 178.

The SSA denied both of Darryl's applications at the initial level on May 19, 2023, and upon reconsideration on June 24, 2024. Tr. 98–99, 103–04, 118–20, 122–24. Administrative Law Judge (ALJ) Ross Stubblefield held a telephonic hearing on November 13, 2024. Tr. 33–52. Darryl's counsel was present at the hearing. Tr. 33, 36.

At the beginning of the hearing, Darryl's counsel requested amendment of the alleged onset date of disability from September 1, 2019, to April 30, 2022—the date of Darryl's motor vehicle accident. Tr. 36. The ALJ accepted that amendment. Tr. 14. Darryl's counsel made opening remarks. She stated that Darryl's ability to work was impacted by both physical and mental impairments. Tr. 38. She stated that his autism, PTSD, depression, and bipolar disorder were particularly significant and limiting. Tr. 38. She asserted that those conditions made it difficult for Darryl to interact with the public, and she stated that one of his psychiatric evaluators, Dr. David McLendon, had concluded that Darryl was better with animals than with people. Tr. 38–39 (referring to Dr. McLendon's Evaluation, Tr. 463–69).

After Darryl's counsel delivered her opening remarks, Darryl testified about his education, recent work history, and medical conditions, Tr. 37–49. Darryl stated that he graduated from high school. Tr. 37–38. He testified that he had worked several jobs in the last few years, but he had not remained employed at any one job for more than thirty days. Tr. 38.

As to his mental conditions, Darryl explained that he had been recently diagnosed with autism. Tr. 39. He stated that his autism kept him from working because it made it difficult for him to interact and get along with others. Tr. 39–40. He stated that he was, at "most times," unable to understand instructions or complete assigned tasks without help. Tr. 40. He testified that he had trouble receiving instructions from others, including his supervisors, because he found instructions to be confusing. Tr. 40. He testified that his autism caused him to break down and "be unable to talk or speak," and that sometimes, he "would just explode." Tr. 41. Darryl stated that he found it overwhelming to "walk outside and interact [with others] to . . . go buy food and talk to the people at the cash register." *Id.*

Darryl also testified about his PTSD, anxiety, and depression. Tr. 42, 44–45. He explained that when he experienced tension and yelling, his PTSD caused him to have flashbacks, violent outbursts, or verbal shutdowns. Tr. 42. He described the verbal shutdowns as "an invisible force that . . . just won't allow me to open my mouth." *Id.* He stated that his depression was caused by "fear and past interaction[s] with people." Tr. 44. He stated that it made him not want to get up, eat, or take showers. *Id.* He said that in the past, his depression had caused him to make bad choices. Tr. 44–45.

Darryl's counsel asked him about Dr. McClendon's report, which, according to counsel, referred to Darryl's problems with attention and concentration. Tr. 45 (citing Tr. 918 on the record, but apparently intending to refer to Dr. McLendon's Evaluation, Tr. 463–69). Darryl testified that his mental health conditions—in particular, his anxiety—caused him to have a short attention span. *Id.* He explained that he was only able to concentrate for a few minutes at a time. *Id.* He said that he was easily distracted, and that he would appear aloof or zoned out when worried. *Id.* He also testified that he had panic attacks and crying spells. Tr. 48. At the time of the hearing, Darryl had panic attacks about once a week, or three to five times a month. Tr. 49. He testified that he had experienced panic attacks more frequently—about two to three times a week—when he was looking for a job. *Id.* He explained that he had panic attacks at work and had to run to the restroom or sit on the floor and put his head between his legs. Tr. 48. He testified that his crying spells occurred randomly and seemingly without reason. *Id.* Darryl stated that other people would freak out and yell at him when he had a panic attack or crying spell. *Id.*

Darryl testified that because of his mental impairments, he had been hospitalized twice in the preceding year, for a total of twelve days. Tr. 41. He also stated that, over the years, he had been treated with many medications at varied dosages. Tr. 42–44. He said that at the time of the hearing, he was taking four medications for his PTSD, anxiety, and bipolar disorder, and to help him sleep. *Id.* The medications made Darryl feel sleepy and drowsy. Tr. 43.

Darryl also testified about his physical condition. He testified that he suffered from back, neck, and shoulder pain resulting from a motor vehicle accident on April 30, 2022. Tr. 45–46. He stated that the accident tore his left shoulder and displaced one of his vertebrae. Tr. 45. He testified that he had to

have surgery on his mid-to-lower back. Tr. 46. He testified that he had pain in his left shoulder, left arm, neck, and back, as well as in the area between the base of his skull and top of his spine. Tr. 45–46. He said that the pain continued through the date of the hearing. *Id.* He testified that the accident also caused him to suffer from migraines and headaches. Tr. 45.

Darryl stated that he experienced the most significant pain in the mornings upon waking up. Tr. 46. He explained it was painful and difficult for him to bend over, and that he worried about having to pick things up. *Id.* He described the pain in his back as "feel[ing] like its pulling, like it's just going to snap." *Id.* Darryl stated that his left shoulder and arm would hurt if moved at certain angles or if he raised his arm above his head. *Id.* He explained that it was difficult to do anything with his left arm. *Id.* He testified, however, that he would be able to lift twenty pounds with his left arm, depending on how long he would have to hold that weight and how far he would have to carry it. *Id.* He stated that he used to lift weights, but that he can no longer do so. Tr. 46–47. Additionally, Darryl stated that his neck would hurt if he looked up or down for too long. Tr. 46. He testified that he had to "switch positions because [his neck] seems like it's going to get stuck." *Id.*

Darryl testified that he also had problems with his knees. Tr. 47. He stated that his knees "popped all the time," and that it was difficult to squat down. *Id.* He testified that if he were to sit in one position for too long, it would feel like his knees and lower back were stuck. *Id.* He stated that he could walk for fifteen to twenty minutes before needing to stop. *Id.* He stated that he could stand for three hours before needing to sit down, and that he could also sit for about three hours. *Id.* However, when asked to clarify whether he could sit or stand for three consecutive hours, he testified that he could not, as he would have to periodically sit or

stand up and move around. Tr. 47–48. He stated that after three hours, he would have to "lay down somewhere." Tr. 48.

A Vocational Expert (VE) testified about Darryl's past work as a pizza delivery driver. Tr. 49–50. The VE stated that the Dictionary of Occupational Titles (DOT) classified the job of delivery driver as an unskilled (SVP 2), light exertion position. Tr. 50.

The ALJ posed a hypothetical question to the VE. He asked the VE to assume a hypothetical claimant who was the same age and had the same level of education and past work experience as Darryl, who was limited to sedentary work, except that he could only occasionally climb ramps, stairs, stoop, kneel, crouch, crawl, and balance; could never climb ropes, ladders, or scaffolds; could only occasionally reach overhead; and could never be exposed to unprotected heights or hazardous machinery. Tr. 50. The ALJ instructed the VE to also assume that the hypothetical claimant had the mental ability to understand, carry out, and remember simple instructions; to respond appropriately to supervisors, coworkers, the public, and usual work situations; to deal with changes in a routine work setting; and to occasionally interact with supervisors, coworkers, and the public. *Id.* The VE testified that a hypothetical claimant with those limitations would not be able to perform Darryl's past work as a delivery driver. *Id.* However, the VE stated that there were other occupations such a person could perform on a full-time competitive basis, including as an optical goods worker, a jewelry preparer, or a sorter. Tr. 50–51.

The ALJ asked the VE whether her answer would change if the hypothetical claimant was further limited to no contact with the public and only rare contact with coworkers and supervisors, and if they were off-task 25% of the time. Tr. 51. The VE testified that with those variations on the hypothetical claimant's limitations, such a person would not be able to perform full-time

competitive work. *Id.* On cross-examination, Darryl's attorney asked the VE whether the jobs of optical goods worker, jewelry preparer, or sorter would remain available if the hypothetical claimant was not off-task 25% of the time, but was limited to no contact with the public and only rare contact with coworkers and supervisors. *Id.* The ALJ stated that those jobs would not remain available. *Id.* The hearing was then closed. Tr. 51–52.

The ALJ issued his decision on November 22, 2024, finding that Darryl was not disabled from April 30, 2022, through the date of the decision. Tr. 11, 17–24. Darryl requested review of the ALJ's decision, which the Appeals Council denied on August 14, 2025. Tr. 1–5, 7. Darryl timely filed a complaint and an application to proceed in forma pauperis in federal court on September 30, 2025. *See Darryl S. v. Bisignano*, No. 4:25-mc-01870, ECF No. 1 (S.D. Tex. Sep. 30, 2025).

***2. Legal Standards***

The Social Security Act provides disability insurance benefits to individuals with physical and mental disabilities who have contributed to the program and provides supplemental income to individuals with physical and mental disabilities who have limited income and resources. *See* 42 U.S.C. §§ 423, 1382. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner uses a sequential, five-step approach to determine whether the claimant is disabled. *Schofield v. Saul*, 950 F.3d 315, 317 (5th Cir. 2020); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof on the first four steps, and the Commissioner bears the burden on the fifth

step. *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021). A finding that the claimant is disabled or not disabled at any point in the five-step review terminates the analysis. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

This court's review of the ALJ's disability determination is "highly deferential." *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018) (citations omitted). The court "ask[s] only whether substantial evidence supports the decision and whether the correct legal standards were employed." *Id.* "A decision is supported by substantial evidence if 'credible evidentiary choices or medical findings support the decision.'" *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (quoting *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016)). "Substantial evidence is 'more than a mere scintilla but less than a preponderance.'" *Id.* (quoting *Williams v. Admin. Rev. Bd.*, 376 F.3d 471, 476 (5th Cir. 2004)). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The reviewing court must scrutinize the record to determine whether substantial evidence supports the ALJ's decision, but it may not reweigh the evidence or substitute its judgment. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

### *3. Analysis*

#### *A. Step One*

At step one, the ALJ must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). A person engaged in substantial gainful activity is not disabled, regardless of their medical condition, age, education, or work experience. *Id.*

The ALJ found that Darryl had not engaged in substantial gainful activity since the alleged onset date of April 30, 2022. Tr. 16. The record reflected that Darryl had worked in 2023, but that work did not qualify as substantial gainful activity. *Id.* Darryl does not dispute the ALJ's step-one finding.

***B. Step Two***

At step two, the ALJ determines whether any of the claimant's impairments, or any combination thereof, is severe and has lasted or is expected to last a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii) (citing 20 C.F.R. § 404.1509); 20 C.F.R. § 416.920(a)(4)(ii) (citing 20 C.F.R. § 416.909). An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment is "not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience." *Keel*, 986 F.3d at 555 (quoting *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985)). "A person who does not have a 'severe impairment' is not disabled." *Schofield*, 950 F.3d at 318 (citing 20 C.F.R. § 404.1520(c)).

The ALJ found that Darryl had medically determinable severe impairments of "major depressive disorder; anxiety disorder; post-traumatic stress disorder (PTSD); autism spectrum disorder; degenerative disc disease of the spine; and left shoulder impingement[.]" Tr. 17. The ALJ's step-two findings are not in dispute.

### *C. Step Three*

At step three, the ALJ determines if any severe impairment meets or equals a listed impairment (Listing) in Appendix 1. 20 C.F.R. § 416.920(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Listing sections describe impairments that the SSA considers "severe enough to prevent an individual from doing any gainful activity, regardless of . . . age, education, or work experience." 20 C.F.R. § 416.925(a). The claimant will be found disabled if the claimant's impairments meet or equal all of the specified criteria of a Listing. 20 C.F.R. § 416.920(d); *Whitehead*, 820 F.3d at 781. The claimant has the burden of establishing that their impairments match the Listing. *Whitehead*, 820 F.3d at 781.

The ALJ considered Listing Sections 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root(s)), 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), 1.18 (abnormality of a major joint(s) in any extremity), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.10 (autism-spectrum disorder), and 12.15 (trauma- and stressor-related disorders), in combination with Social Security Ruling (SSR) 19-2p (Evaluating Cases Involving Obesity). Tr. 17. The ALJ determined that Darryl did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment in the Listing sections. *Id.* Darryl does not dispute this finding.

Although "[o]besity is not a listed impairment," it may cause functional effects that may increase the severity or functional limitations of the individual's other impairments. SSR 19-2p, 2019 WL 2374244, at *2. "No specific weight or BMI establishes obesity as a 'severe' or 'not severe' impairment." *Id.* Instead, an ALJ must assess "the effect of obesity on a person's functioning when deciding whether the impairment is severe." *Id.* at *4. In Darryl's case, the ALJ noted that while Darryl's obesity was

medically determinable, "it [did] not cause or contribute to any significant limitations on [his] ability to perform basic work activities. Tr. 17. The ALJ stated that there was "no evidence of any specific or quantifiable impact on [Darryl's] pulmonary, musculoskeletal, endocrine, or cardiac function." *Id.* The ALJ stated that he nevertheless considered the effect of obesity on Darryl's other physical and mental impairments, singly and in combination. *Id.*

The ALJ determined that Darryl's musculoskeletal impairments did not meet or equal the severity of impairments in Listing Sections 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root(s)), 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), or 1.18 (abnormality of a major joint(s) in any extremity) through the date he was last insured. Tr. 17. The ALJ explained that Darryl did not meet the criteria of Listing Sections 1.15 and 1.16 because he did not have a disorder of the spine that resulted in a compromised nerve root or spinal cord. *Id.* (citing Tr. 453, 455, 458–59). As to Listing Section 1.18, the ALJ found that Darryl did not meet the criteria for abnormality of the major joints in the upper extremities because he was capable of using his arms to initiate, sustain, and complete work-related activities involving fine and gross movements. *Id.*

The ALJ also determined that Darryl's mental impairments, considered singly and in combination, did not meet or equal the severity of impairments in Listing Sections 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.10 (autism-spectrum disorder), or 12.15 (trauma- and stressor-related disorders) because Darryl did not satisfy the "paragraph B" or the "paragraph C" criteria. Tr. 18–19. To be found disabled at step three, the claimant's mental disorder must satisfy either the requirements of both paragraphs A and B,

or the requirements of both paragraphs A and C. Listing § 12.00(A)(2). A claimant who does not satisfy either of paragraphs B or C cannot meet or equal the severity of impairments in the Listings in Section 12.

The paragraph B criteria "represent the areas of mental functioning a person uses in a work setting." Listing § 12.00(A)(2)(b). Those areas are the claimant's ability to (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* The ALJ must evaluate the claimant's ability to function in each of the four areas using this five-point rating scale:

> a. No limitation (or none). [Claimant is] able to function in this area independently, appropriately, effectively, and on a sustained basis.
>
> b. Mild limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.
>
> c. Moderate limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.
>
> d. Marked limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.
>
> e. Extreme limitation. [Claimant is] not able to function in this area independently, appropriately, effectively, and on a sustained basis.

Listing § 12.00(F)(2). To meet the paragraph B criteria, a claimant's disorder must result in an "extreme" limitation in one or a "marked" limitation in two of the four areas of mental functioning. *Id.* The ALJ found that Darryl had only mild or moderate limitations in each of the four areas. Tr. 18.

As for understanding, remembering, or applying information, the ALJ determined that Darryl had a moderate limitation. Tr. 18. The ALJ discussed Darryl's own statements relevant to this area of mental functioning. *Id.* He explained that Darryl alleged that he had difficulty with remembering information, understanding what was said to him, following instructions, and completing tasks. *Id.* (citing Hearing Testimony). The ALJ noted that Darryl stated that he was capable of going to doctor's appointments, taking medications, using public transportation, shopping, and playing video games. *Id.* (citing Hearing Testimony; Tr. 230–37, 260–67). The ALJ explained that the record showed that Darryl could provide information about his health, follow instructions from healthcare providers, comply with treatment protocols, and describe his work history. *Id.* The medical evidence reflected that Darryl had "fair to intact memory" and an average IQ. *Id.* (citing Tr. 610, 614, 619, 644, 660, 861, 878, 889, 900, 918, 921, 926, 929, 958, 993, 997, 1000, 1008, 1016; Dr. McLendon's Examination, Tr. 465). However, the ALJ noted that there was some evidence in Darryl's medical record that showed deficits in this area of mental functioning. *Id.* (citing Tr. 644). Accordingly, the ALJ determined that Darryl had no more than a moderate limitation in understanding, remembering, or applying information.

As for interacting with others, the ALJ determined that Darryl had a moderate limitation. Tr. 18. Darryl alleged that he had difficulty engaging in social activities, getting along with others, and dealing appropriately with authority. *Id.* However, Darryl also stated that he was able to get along with others, to deal appropriately with others, to shop in stores, and to take public transportation. *Id.* (citing Hearing Testimony; Tr. 230–37, 260–67). The ALJ noted that in Darryl's medical records, he was repeatedly described as "pleasant and cooperative," and he was

noted to have had "good interactions with non-medical staff." *Id.* (citing Tr. 396, 407, 416, 425, 610, 614, 619, 640, 644, 660, 861, 878, 889, 900, 918, 921, 958, 993, 997, 1000, 1008, 1016). The ALJ stated that the record also reflected notes about Darryl experiencing social issues. *Id.* (citing Dr. McLendon's Examination, Tr. 463–69). Accordingly, the ALJ determined that the evidence supported the conclusion that Darryl had "some limitations in interacting with others[,]" but no greater than a moderate degree of limitation. *Id.*

As for concentrating, persisting, or maintaining pace, the ALJ determined that Darryl had a moderate limitation. Tr. 18. Through his statements, Darryl alleged that he had trouble concentrating, focusing, avoiding distractions, following instructions, and completing tasks, but he also stated that he was capable of watching TV, playing games, using the internet, and handling his own medical needs. *Id.* (citing Hearing Testimony; Tr. 230–37, 260–67). The ALJ stated that the record showed that Darryl sometimes demonstrated intact attention and concentration, but that he also occasionally exhibited deficits in those areas. *Id.* (citing Tr. 610, 614, 619, 640, 644, 660, 861, 878, 889, 900, 918, 921, 861, 878, 889, 900, 918, 921, 926, 929, 958, 993, 997, 1000, 1008, 1016). The ALJ concluded that because the record reflected both strong and deficient functioning in this area of mental function at various points in time, Darryl had no more than a moderate limitation.

As for adapting or managing oneself, the ALJ determined that Darryl had a mild limitation. Tr. 18–19. Darryl asserted that he found it difficult to manage his mood, but that he was able to manage self-care and personal hygiene. *Id.* (citing Hearing Testimony). The ALJ explained that the objective evidence in the record was consistent with Darryl's assertions. *Id.* (citing Tr. 610–62, 859–922, 925–1045). Accordingly, the ALJ concluded

that Darryl had a mild limitation in his ability to adapt or manage himself.

Because Darryl did not have at least two "marked" limitations or one "extreme" limitation in the four areas of mental functioning, the ALJ determined that he did not satisfy the paragraph B criteria. Tr. 19.

The ALJ also determined that Darryl failed to satisfy the paragraph C criteria. Tr. 19. The ALJ explained that while the record showed that Darryl had a medically documented history of mental impairments existing over a period of at least two years, it did not show the existence of a marginal adjustment—a minimal capacity to adapt to changes in the claimant's environment or to demands that were not already a part of their daily life. *Id.*; *see also* Listing § 12.00(G)(2) (explaining the paragraph C criteria).

The ALJ's step-three determination is supported by substantial evidence and comports with the law. The step three findings are not directly in dispute, although Darryl maintains that the ALJ did not sufficiently account for Darryl's mental limitations in formulating the RFC, which is discussed below. Darryl does not point to any evidentiary or legal error in the ALJ's step three findings. The ALJ specifically cited portions of the record in making his step three findings. Having reviewed the record and the briefing, the court detects no error—legal or factual.

***D. Residual Functional Capacity***

Before reaching the final two steps, the ALJ must assess the claimant's residual functional capacity (RFC). 20 C.F.R. § 404.1520(e) (citing 20 C.F.R. § 404.1545); 20 C.F.R. § 416.920(e) (citing 20 C.F.R. § 416.945). The RFC is a determination of the most a claimant can do despite all physical and mental limitations. *Perez*, 415 F.3d at 461–62 (citing 20 C.F.R. § 404.1545(a)(1)). The RFC determination is based on "the medical evidence in the record,

including the testimony of physicians and the claimant's medical records." *Webster v. Kijakazi*, 19 F.4th 715, 718 (5th Cir. 2021). "An 'ALJ is responsible for determining an applicant's residual functional capacity.'" *Id.* (quoting *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)); *see also* 20 C.F.R. §§ 404.1546(c), 416.946(c).

The ALJ determined that Darryl had the RFC to perform sedentary work, except that he is limited by the following:

> no climbing ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs, stoop, kneel, crouch, crawl, and balance. He must avoid all exposure to unprotected heights and hazardous machinery. He can understand, remember, and carry out simple instructions; respond appropriately to supervisors, coworkers, the public, and usual work situations; and can deal with changes in a routine work setting. He can have only occasional interaction with the public, coworkers, and supervisors.

Tr. 19. In making his determination, the ALJ considered the entire record, including Darryl's hearing testimony, the statements that Darryl made to medical providers, Darryl's medical records, and the various statements and opinions of Darryl's medical providers. *Id.*

As for Darryl's statements at the hearing and those made to medical providers, the ALJ's summary is consistent with Darryl's hearing testimony, which the court summarized above. Essentially, Darryl maintains that he is extremely limited physically and mentally. Tr. 20. He indicated that his conditions affected his ability to perform a variety of physical movements and mental processes. *Id.* (citing Tr. 220–37, 254–73). However, Darryl also indicated that he was mostly able to take care of himself, including by managing his medical conditions, and able to perform tasks of daily living, including shopping in stores, paying bills, consuming media, and spending time with family. *Id.* (citing Tr. 220–37, 254–73). Darryl stated that he was medicated for his

mental conditions, but that even with those medications, he experienced several panic attacks each month. *Id.* (citing Hearing Testimony). He also testified that he had difficulty with interpersonal relationships, particularly in communicating with others. *Id.* (citing Hearing Testimony).

The ALJ found that, while Darryl's medically determinable impairments could reasonably be expected to cause his alleged symptoms, his statements about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. Tr. 20. The court turns next to an analysis of that finding.

As to Darryl's physical limitations, the ALJ stated that the record showed that Darryl did not receive ongoing medical treatment for his complained-of physical ailments. Tr. 20. The ALJ explained that the record did show that Darryl had sought treatment in 2022 for his neck, shoulder, and back pain, after his motor vehicle accident in April of that year. *Id.* (citing Tr. 396–400, 405, 411, 419, 432, 453, 455–56, 458–59). The ALJ noted that Darryl's exams after the accident initially demonstrated physical deficits, but that those deficits improved over time with medical treatment. *Id.* (citing Tr. 425–28). In October 2022, Darryl had rated his neck, shoulder, and back pain as "low," and he told his provider that the pain had subsided. *Id.* (citing Tr. 425). He also indicated that he was not taking pain medications. *Id.* (citing Tr. 425). The ALJ stated that Darryl's subsequent physical exams were normal, and in January 2024, Darryl denied having back pain. *Id.* (citing Tr. 715, 720). The ALJ noted that at the time of the hearing, Darryl was not taking pain medications or receiving ongoing treatment for his neck, shoulder, or back. *Id.* The ALJ also noted that Darryl was able to complete activities of daily living, including recreational and self-care activities, as described above. *Id.* (citing Hearing Testimony; Tr. 230–37, 260–67). Accordingly,

the ALJ concluded that while the record demonstrated that Darryl was somewhat limited as a result of his physical impairments, those physical limitations could be accommodated through a restriction to sedentary work with additional postural and hazard restrictions. *Id.*

As to Darryl's mental limitations, the ALJ stated that Darryl had a history of depression, anxiety, autism, and PTSD, for which he sought treatment, in the form of office visits and medication management, on a generally consistent basis. Tr. 21 (citing Dr. McClendon, Tr. 468; Darryl's Medical Records, Tr. 470–922). The ALJ noted that Darryl was hospitalized for eight days in January 2024 due to experiencing suicidal ideations. *Id.* (citing Tr. 962, 990–1045). The ALJ also noted, however, that about two months after his hospitalization, Darryl reported that he had been doing well and that his mood was stable. *Id.* (citing Tr. 859). In April 2024, Darryl began attending weekly psychotherapy sessions with Dr. Blassingame. *Id.* (citing Tr. 931). Dr. Blassingame's April 16, 2024 mental status exam showed that Darryl "was not homicidal or suicidal[,] and he exhibited rather normal findings . . . ." *Id.* (citing Tr. 925–27).

The ALJ explained that the RFC restriction limiting Darryl to carrying out simple instructions is supported by the record. Tr. 21. The ALJ noted that the objective medical evidence showed only mild issues in Darryl's memory and concentration. *Id.* (citing Dr. McClendon, Tr. 463–69; Tr. 610–62, 859–922, 925–1045). Additionally, the ALJ stated that Darryl's demonstrated ability "to function in his daily routine" undermined the allegation that his mental limitations are "debilitating." *Id.* (citing Hearing Testimony; Tr. 230–37, 260–67).

The ALJ also explained his inclusion in the RFC of the restriction limiting Darryl to only occasional interaction with coworkers, supervisors, and the public. Tr. 21. The ALJ considered Darryl's hearing testimony about his difficulty interacting with other people, as well as his statements about his ability to use public transportation and shop in stores. *Id.* (citing Hearing Testimony; Tr. 230–37, 260–67). The ALJ characterized Darryl's hearing testimony as "articulate, coherent, and engaging . . . ." *Id.* Additionally, the ALJ stated that the medical evidence showed that Darryl's mood had improved over time. *Id.* (citing Tr. 859). The ALJ thus concluded that Darryl's limitations in social functioning were not as severe as Darryl alleged, but that the record supported a limitation to only occasional interaction with coworkers, supervisors, and the public. *Id.*

The ALJ next reviewed the initial and reconsideration opinions of the state agency medical consultants (SAMCs) and state agency psychological consultants (SAPCs). Tr. 21–22. The SAMCs and SAPCs reviewed Darryl's medical records and evaluated the severity of his impairments. *Id.* In April 2023, SAMC Dr. Jeanine Kwun evaluated Darryl at the initial level. Tr. 21. Dr. Kwun opined that Darryl could push, pull, lift, or carry ten pounds frequently and twenty pounds occasionally, could sit for a total of six hours in an eight-hour workday, and could stand or walk for a total of six hours in an eight-hour workday. *Id.* (citing Tr. 58, 66). Over a year later, SAMC Dr. Phillip Matar "concurred with most of Dr. Kwun's opinion but added" that Darryl could never climb ladders, ropes, or scaffolds, and that he was capable of "perform[ing] all other posturals frequently." Tr. 21–22 (citing Tr. 78–80, 90–92). The ALJ did not find either of the SAMC opinions persuasive because they were not consistent with diagnostic imaging of Darryl's neck and back, which showed "cord involvement in [Darryl's] neck and thecal sac involvement in the

low back." Tr. 22 (citing Tr. 396–461). The ALJ stated that the diagnostic imaging supported limiting Darryl to sedentary work. *Id.* (citing Tr. 396–461).

At the initial level, SAPC Dr. Byron Pack opined that Darryl was "maximally able to understand, remember, and carry out only simple instructions, make simple decisions, and attend and concentrate for extended periods." Tr. 22 (citing Tr. 60, 68). Dr. Pack also found that Darryl could adequately interact with his coworkers and supervisors. *Id.* (citing Tr. 60, 68). The ALJ concluded that Dr. Pack's opinion was "mostly persuasive" in that it limited Darryl to simple work. *Id.* However, the ALJ explained that the opinion was not fully persuasive because it "fail[ed] to incorporate social limitations[.]" *Id.* The ALJ stated that the record supported limiting Darryl "to simple work with occasional social restrictions." *Id.*

On reconsideration, SAPC Dr. Nicole Mannis opined that Darryl was able to understand, remember, and carry out detailed, but not complex, instructions, and that he could make basic decisions, concentrate for extended periods, and respond appropriately to changes in the workplace. *Id.* (citing Tr. 81, 93). Dr. Mannis also opined that Darryl was capable of interacting with others. *Id.* (citing Tr. 81, 93). The ALJ did not find Dr. Mannis's opinion persuasive because he believed that it was inconsistent with the findings that Darryl exhibited inattentiveness and shallow concentration. *Id.*

The RFC was determined according to the appropriate legal framework and is supported by substantial evidence. Each of the physical and psychological limitations is supported by the record. The ALJ considered all of the evidence in the record and weighed its credibility. While Darryl testified about and reported to his medical providers many disabling symptoms, the ALJ did not credit all of his statements. None of the evidence that the ALJ

found credible supports further limitations with respect to Darryl's ability to perform sedentary work or interact with others. As the ALJ summarized in his decision, while Darryl had been injured in the 2022 motor vehicle accident, the objective medical evidence showed that Darryl's physical condition had improved over time, and that he had not sought continuous treatment for his complained-of injuries. The ALJ nevertheless concluded that it was appropriate to limit Darryl to sedentary work with certain activity and environmental limitations. Moreover, as the ALJ explained, Darryl was capable of completing activities of daily living, including managing his self-care needs, using public transportation, shopping in stores, and paying bills. The ALJ accounted for Darryl's documented issues with concentration by limiting Darryl to simple work. The ALJ also accounted for Darryl's problems with social interaction, which appear to be attributed largely to his autism, by limiting him to only occasional interaction with coworkers, supervisors, and the public. Those facts fully support the RFC.

In his Motion for Summary Judgment, Darryl makes several related arguments criticizing the ALJ's RFC findings. Essentially, Darryl argues that the ALJ's RFC finding is not supported by substantial evidence because, according to Darryl, the ALJ relied on his own lay interpretation of the medical evidence in formulating the RFC. ECF No. 11. In support of his argument, Darryl cites two Fifth Circuit cases—*Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995) and *Williams v. Astrue*, 355 F. App'x 828 (5th Cir. 2009). ECF No. 11 at 4–10. Darryl argues that the ALJ violated the Fifth Circuit's holdings in *Ripley* and *Williams* by rejecting all medical opinions and determining the RFC without a supporting medical opinion. *Id.*

The regulations do not prohibit the ALJ from assessing the claimant's RFC based on other record evidence when the ALJ finds the available medical opinions to be unpersuasive. 20 C.F.R. §§ 404.1545(a)(1), (a)(3), (e). The regulations place the responsibility upon the ALJ to assess a claimant's RFC "based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. § 404.1545(a)(1); *see also* 20 C.F.R. § 404.1546(c). Courts regularly affirm ALJ decisions where all medical opinion evidence has been rejected as unpersuasive. In the absence of medical opinions, courts have found evidence such as MRI and EEG test results, neurophysiological studies, treating physician remarks, physical examinations, and the claimant's own testimony to be substantial evidence to support the ALJ's RFC determination. *See Taylor v. Astrue,* 706 F.3d 600, 603 (5th Cir. 2012) (considering MRI and EEG results, neurophysiological studies, and treating physician remarks); *Garza v. Astrue,* No. 09-0133, 2013 WL 2432421, at *15–16 (S.D. Tex. June 3, 2013) (considering physical examinations and general medical evidence); *Gutierrez v. Barnhart,* No. 04-11025, 2005 WL 1994289, at *7 (5th Cir. Aug. 19, 2005) (per curiam) (stating that "the ALJ's determination of [the claimant's] residual functional capacity is based on substantial evidence even without such a medical opinion").

In *Ripley,* the Fifth Circuit remanded the case because, among other errors, the ALJ found the claimant was capable of sedentary work "even though there was *no medical testimony* supporting this conclusion." 94 F.3d at 557 (emphasis added). The Court pointed out that "[t]he absence of such a [medical source] statement . . . does not, in itself, make the record incomplete." *Id.* The Court explained that, in the absence of a medical statement, the Court focuses on whether the ALJ's decision is supported by substantial evidence in the existing record. *Id.* The Court concluded that the ALJ's opinion was not supported by substantial evidence

because the record contained "a vast amount of medical evidence" establishing an impairment that the ALJ did not consider in formulating the RFC. *Id.*

Here, Darryl asks the court to rely primarily on his own self-reported symptoms made to medical providers, during the hearing, and in his function reports. The ALJ did not find Darryl's subjective statements to be fully credible, and he instead relied on other evidence in the record. The record is replete with evidence supporting the RFC. Moreover, the RFC accounts for the limitations that Darryl claims to have.

Darryl also cites *Williams,* 355 F. App'x 828 (5th Cir. 2009). ECF No. 11 at 6, 15. In *Williams*, the Fifth Circuit remanded because "there was *no medical or other evidence* supporting the ALJ's [RFC] determination." 355 F. App'x at 831 (emphasis added). The Court found that, once the ALJ refused to give controlling weight to certain medical opinions, there was no evidence left to support the ALJ's RFC finding. The Court also pointed out that "the ALJ failed to consider [a] physical therapy discharge summary [that] directly contradicts the ALJ's finding." *Id.* The Court concluded that, in the face of contradictory evidence and with no evidence supporting the ALJ's RFC finding, the RFC was not supported by substantial evidence. *Id.* at 832. Importantly, the Court explained that *Ripley* stood for the proposition that "an ALJ may not rely on his own *unsupported* opinion as to the limitations presented by the [claimant's] medical conditions." *Id.* at 832 n.6 (emphasis added) (citing *Ripley,* 97 F.3d at 557).

This case does not present the same problems as *Ripley* and *Williams* did. The ALJ did not reject all of the medical opinions pertaining to Darryl's mental health in their entirety. He found SAPC Dr. Pack's opinion mostly persuasive, but he explained that he did not find it to be fully persuasive because it failed to incorporate social limitations. Citing Darryl's testimony and the

evaluations of Darryl's medical providers, the ALJ stated that both of the SAPC opinions were inconsistent with Darryl's documented inattentiveness and shallow concentration. The ALJ explained that because of that record evidence, Darryl should be limited to simple work with occasional social restrictions. The ALJ also discussed, in detail, the objective medical evidence pertaining to Darryl's physical limitations. Unlike *Ripley* and *Williams*, the ALJ's conclusion that none of the opinions were fully persuasive did not leave the RFC determination without support. The ALJ fully and fairly developed the record, and he properly considered all of the evidence in the record in making his RFC determination. The ALJ's decision is supported by substantial evidence.

Darryl also suggests that the ALJ erred by failing to articulate how persuasive he found Dr. McLendon's report. ECF No. 11 at 13. The Commissioner asserts that Darryl waived that argument by failing to adequately brief the issue. ECF No. 15 at 12 n.2 (citing *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.")). Darryl raised the issue in just one sentence of his seventeen-page Motion for Summary Judgment. ECF No. 11 at 13 ("There was no further mention of Dr. McLendon's findings and no persuasive finding done as the regulations require. 20 C.F.R. 404.1520(c) and 416.920(c)."). In his reply, he included a somewhat more thorough argument on the issue. ECF No. 16 at 11. However, because Darryl failed to adequately brief the argument in the first instance, it was waived. Out of an abundance of caution, the court nevertheless briefly addresses the argument.

To determine "what weight, if any, to give a medical opinion," ALJs consider a list of factors, outlined in 20 C.F.R. § 404.1520c. In his decision, the ALJ must explain his consideration of the supportability and consistency factors.

20 C.F.R. § 404.1520c(b)(2). The supportability factor relates to how much the objective medical evidence and the medical source's explanation supports the medical opinion, while the consistency factor relates to the medical opinion's consistency with evidence from other medical sources. 20 C.F.R. § 404.1520c(c)(1)–(2). A medical opinion is defined in 20 C.F.R. § 404.1513(a)(2) as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations in [a list of abilities]." That list of abilities contains the paragraph B criteria discussed above in step three. 20 C.F.R. § 404.1513(a)(2)(ii).

For the purposes of this Memorandum and Opinion, the court assumes, without deciding, that Dr. McLendon's report qualifies as a medical opinion under the regulations. The report is from a medical source, and it includes statements that bear on the impact of Darryl's mental conditions on his ability to work. For example, Dr. McLendon stated that Darryl's conditions "constitute[d] significant limitations that disrupt[ed] his functioning at all levels." Tr. 469. Dr. McLendon also stated that Darryl had "a good ability to work" and to do so "cooperatively and consistently[,]" though his overall prognosis for future employment was "guarded" because of his "multiple and interactive psychological problems." *Id.* Assuming those statements are enough to qualify Dr. McClendon's report as an opinion, the ALJ should have articulated its level of persuasion.

Although the regulations require the ALJ to articulate his consideration of the supportability and consistency factors, the failure to do so warrants relief from the decision only when the error has prejudiced the plaintiff. *See Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017) (quoting *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)) ("Procedural perfection in administrative proceedings is not required as long as the

substantial rights of a party have not been affected.") "This Court requires . . . a showing that the claimant was prejudiced by the agency's failure to follow a particular rule before such a failure will be permitted to serve as the basis for relief from an ALJ's decision." *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001) (citation omitted). "Prejudice can be established by showing that the additional considerations 'might have led to a different decision.'" *Mettlen v. Barnhart*, 88 F. App'x 793, 793 (5th Cir. 2004) (quoting *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)).

The court turns to whether any error caused harm. Darryl appears to argue that, had the ALJ properly considered Dr. McLendon's opinion, the ALJ would have found him disabled because the RFC would have included additional mental limitations that may have altered the analysis at steps four and five. ECF No. 11 at 12–13. Darryl, however, does not specify what those additional mental limitations would be. *See id.*; ECF No. 16.

The ALJ's RFC limited Darryl to only occasional interaction with his coworkers, his supervisors, and the public, as well as understanding, remembering, and carrying out simple instructions. The ALJ accounted for Dr. McLendon's findings in his discussion of the paragraph B criteria, which Darryl does not take issue with, and in his RFC determination. The ALJ cited Dr. McLendon's report in his explanation of the step-three determination that Darryl was moderately limited in his ability to interact with others. The ALJ's multiple references to Dr. McLendon's report establish that the ALJ found the report credible and that his RFC determination was influenced by the report. Thus, while the ALJ failed to articulate how persuasive he found Dr. McLendon's report, there is no reason to believe that such articulation would have led to a different result. Darryl points to nothing in McLendon's report that, if taken as true, would require limitations beyond those the ALJ included in the RFC.

Darryl also argues that the ALJ erred by failing to fully develop the record. Darryl faults the ALJ for not ordering a further consultative examination. The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits." *Brown v. Saul*, 858 F. App'x 711, 713 (5th Cir. 2021) (quoting *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001)). When an ALJ makes "an informed decision based on sufficient facts[,]'" the ALJ fulfills the duty to develop the record. *Id.* (quoting *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996)). Reversal of the ALJ's decision is proper only if the claimant shows that "he could and would have adduced evidence that might have altered the result." *Id.* (quoting *Brock*, 84 F.3d at 728). The mere assertion "that additional beneficial evidence might have been gathered . . . is insufficient" to show prejudice. *Jones v. Astrue*, 691 F.3d 730, 735 (5th Cir. 2012). The decision whether a consultative examination is needed is within the ALJ's discretion and is required only if it is necessary to enable the ALJ to make the disability decision. *Brown*, 858 F. App'x at 713. As discussed, there was sufficient evidence in the existing record for the ALJ to make his disability determination. The ALJ was not required to order a consultative examination.

The ALJ's conclusions are based on Darryl's testimony and a thorough reading of the record. Darryl failed to demonstrate that he is more limited than the ALJ found. He points to no evidence that the ALJ credited that would require further limitations. The record is replete with evidence supporting the RFC. The RFC was determined according to the appropriate legal framework and is supported by substantial evidence. The court finds no error—legal or factual—in the ALJ's RFC assessment.

### *E. Step Four*

At step four, the ALJ determines whether the claimant can perform their past work by comparing the RFC with the demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(f); 416.920(f); *see also Perez*, 415 F.3d at 462. To demonstrate that they are disabled, the claimant must show that they lack the RFC to perform "the functional demands of any of their [past relevant work] as they actually performed it or as it is generally performed in the national economy." SSR 24-2p, 2024 WL 3291790, at *4. If the claimant can perform their past work, they are not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant cannot perform their past work, the ALJ proceeds to step five. *See* 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

The ALJ posed a hypothetical to the VE during the hearing that contained all of the limitations in the RFC that the ALJ ultimately found. Tr. 50. The VE testified that a person of the same age, education, past work history, and limitations as Darryl would not be able to perform Darryl's past work as delivery driver. *Id.* Based on the VE's testimony, the ALJ concluded that Darryl could not perform his past work as a delivery driver. Tr. 22.

Because the VE's testimony was based on the ALJ's hypothetical question that incorporated all the limitations reasonably recognized by the ALJ, and because Darryl's attorney had the opportunity to cross-examine the VE, the VE's testimony is substantial evidence supporting the ALJ's step-four determination. *See Masterson v. Barnhart*, 309 F.3d 267, 273–74 (5th Cir. 2002) (holding that the ALJ properly relied on the VE's testimony because the ALJ "scrupulously incorporated" all the limitations "supported by the evidence and recognized by the ALJ" and gave an opportunity for cross examination). Accordingly, the ALJ's findings at step four are supported by substantial evidence and are not the product of legal error.

### *F. Step Five*

At step five, the ALJ determines whether the claimant can perform any other work by considering the claimant's RFC and other factors, including age, education, and past work experience. *Schofield*, 950 F.3d at 318 (quoting 20 C.F.R. § 404.1520(a)(4)(v)). If the claimant can perform other work available in significant numbers in the national economy, the claimant is not disabled. *Id.* (citing 20 C.F.R. § 404.1520(g)).

The ALJ found that Darryl could perform jobs that exist in significant numbers in the national economy. Tr. 23. As such he found Darryl to be not disabled. Tr. 23–24. The ALJ relied on the VE's testimony that an individual of Darryl's age, education, work experience, and RFC would be able to work as an optical goods worker or jewelry preparer. Tr. 50.

As was the case in step four, because the VE's testimony was based on the ALJ's hypothetical question that incorporated all the limitations reasonably recognized by the ALJ, and because Darryl's attorney had the opportunity to cross-examine the VE, the VE's testimony is substantial evidence supporting the ALJ's step-five determination.

Accordingly, the ALJ's findings at step five are supported by substantial evidence and are not the product of legal error.

### *4. Conclusion*

The ALJ's decision denying social security benefits is consistent with the law and supported by substantial evidence. There is no genuine issue of material fact, and summary judgment is appropriate. Fed. R. Civ. P. 56(a), (c).

Accordingly, Plaintiff's Motion for Summary Judgment, ECF No. 11, is **DENIED**. Commissioner's Motion for Summary Judgment, ECF No. 15, is **GRANTED**, and the Commissioner's final decision is **AFFIRMED**.

A separate final judgment will be entered.

Signed at Houston, Texas, on September 16, 2026.

Peter Bray
United States Magistrate Judge